## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

BRENDA HAIRSTON,

        Plaintiff,

     v.

COMMUNITY HOSPITAL HOLDING
COMPANY, LLC, d/b/a OPTIM HEALTH
SERVICES,

        Defendant.

CIVIL ACTION NO.: 4:22-cv-193

## <u>O R D E R</u>

    Plaintiff Brenda Hairston sued Community Hospital Holding Company, LLC d/b/a Optim

Health Systems ("Optim Health"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e, et seq. ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the Americans with

Disabilities Act, 42 U.S.C. §12101, et seq. ("ADA"), alleging, among other things, that she was

discriminated and retaliated against because of her race and disability.  (Doc. 1.)  Presently before

the Court is Optim Health's Motion for Summary Judgment, in which it argues that Plaintiff has

failed to raise a genuine issue of material fact that she was discriminated against because of her

disability or that her filing a race discrimination complaint caused her termination.  (Doc. 28.)

Plaintiff filed a Response, (doc. 39), Optim Health filed a Reply, (doc. 42), and Plaintiff filed a

Sur-Reply (doc. 44).  For the reasons below, the Court **GRANTS** Defendant Optim Health's

Motion for Summary Judgment.  (Doc. 28.)

## BACKGROUND

### I.      Plaintiff's Employment with Optim Health

In May 2018, Plaintiff Brenda Hairston, an African American woman, began working as a claims analyst for Optim Health through a staffing agency.  (Doc. 39-2, p. 1; doc. 41, p. 3.)  In this position, Plaintiff helped collect outstanding medical debt from patients and third-party insurance providers, in particular Optim Health's outstanding Medicare accounts.  (Doc. 39-2, pp. 1–2.)  Plaintiff accepted a full-time position as a claims analyst in the Billing Department at Optim Health in October 2018.  (Id. at p. 2.)  Throughout her employment at Optim Health, Plaintiff's supervisor was Cindi Ashley.  (Id.)  Ashley participated in Optim Health's decision to hire Plaintiff.  (Id.)

In February 2019, Optim Health began utilizing Robin Workman, a medical billing and coding consultant, to review its outstanding claims and ensure proper collection practices across its Billing Department.[1]  (Id.; see doc. 36, pp. 120–21.)  As part of her duties, Workman often emailed members of the Billing Department to address open claims and their status.  (Doc. 39-2, p. 2; see doc. 36, pp. 120–23.)  Workman sent numerous emails to Billing Department employees—including Plaintiff and also employees who were white—when they had deficiencies, asking about the status of open accounts.  (Doc. 39-2, p. 3; see doc. 36, pp. 120–23.)

On March 21, 2019, Plaintiff applied for a position in Optim Health's Pre-Certification Department, despite having no history working in a pre-certification position.  (Doc. 39-2, p. 3; see doc. 29-8, p. 14.)  Plaintiff was interviewed by Latashia McGruder and Michelle Magdeburg

---

[1]  In her Response to Optim Health's Statement of Undisputed Material Facts, Plaintiff does not dispute many facts put forth by Optim Health and simply states that the purported facts are "immaterial."  (See, e.g., doc. 39-2, p. 2.)  Under the Local Rules for the Southern District of Georgia, "[a]ll material facts set forth in the statement [of undisputed material facts] . . . will be deemed to be admitted unless controverted by a statement served by the opposing party."  S.D. Ga. L.R. 56.1.  Accordingly, the Court will consider Optim Health's unobjected to facts admitted for the purpose of this Motion, so long as they are supported by record citations.  See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1303 (11th Cir. 2009).

on March 25, 2019.  (Doc. 39-2, p. 3.)  Neither McGruder nor Magdeburg spoke with Ashley about Plaintiff before the interview.  (Id.; see doc. 29-3.)

On March 26, 2019, Ashley met with Plaintiff to give her a verbal warning regarding open and delinquent accounts.  (Doc. 39-2, p. 3; see doc. 29-8, pp. 18–20.)  At the time of this meeting, Ashley was unaware of Plaintiff's application for the precertification position.  (Doc. 39-2, p. 4; see doc. 29-8, p. 5.)  Ashley also counseled and emailed other members of Optim Health's Billing Department regarding deficiencies on their accounts.  (Doc. 39-2, p. 4; see doc. 36, p. 120–23.)

On March 27, 2019, Plaintiff emailed Human Resources to ask about the status of the pre-certification position, and she was informed that it remained open as the company was still interviewing for the position.  (Doc. 39-2, p. 4; see doc. 29-8, pp. 15–16.)

## II.    Plaintiff's Grievance Letter and Optim Health's Investigation

On April 2, 2019, Plaintiff emailed an internal written grievance letter to Natalie Tambon, Director of HR, David Perry, CEO, and Don Taylor, Revenue Cycle Manager.  (Doc. 39-2, p. 4.)  Plaintiff's grievance alleged that Ashley had discriminated against her on the basis of race and had retaliated against her for applying for the pre-certification position.  (Id.)  In the grievance letter, Plaintiff does not allege any derogatory comments made by Ashley involving her race.  (Id. at p. 5; see generally doc. 29-4.)  Instead, Plaintiff's grievance focused on Ashley's behavior towards Plaintiff—including increased work demands and "flooding" Plaintiff with emails—which she believed was because of her race.  (Doc. 39-2, p. 5; see doc. 29-4.)  Plaintiff also alleged that she believed Ashley was "developing a pattern of how she discriminates against African American Women who she manages," (doc. 29-4, p. 3).  (Doc. 41, p. 4.)

Tambon claims that, in response to Plaintiff's grievance letter, she investigated the claims and found no evidence of discrimination or retaliation by Ashley.  (Doc. 39-2, p. 6–7; see doc. 29-

10, p. 2.)  Tambon testified that she interviewed multiple people, took statements, and looked at the treatment of other employees in the Billing Department.  (Doc. 39-2, p. 8; doc. 29-10, p. 2; doc. 36, pp. 67, 120–24.)  Tambon believed that Plaintiff was complaining about increased work expectations and follow-ups.  (Doc. 39-2, p. 7; see doc. 29-10, p. 2; doc. 36, pp. 120–23.)  Tambon found that, during the same timeframe, Ashley was writing up other employees in the Billing Department who had delinquent work because of the increased work expectations flowing from Workman's oversight.  (Doc. 39-2, p. 7–8; see doc. 29-10, p. 2; doc. 36, pp. 120–23.)  Tambon testified that she found no evidence that Ashley discriminated against Plaintiff in her investigation. (Doc. 39-2, p. 8; see doc. 29-10, p. 2.)

Tambon testified that, as a standard practice, once she receives an employee complaint of disability or race discrimination, she conducts an investigation that includes speaking to the complaining employee, speaking to other employees who are involved, and reviewing relevant documents.  (Doc. 41, pp. 5–6.)  She also stated that her standard practice is to document the conversations after interviewing the employee who made the complaint, and to memorialize the investigation's findings in a summarizing document.  (Id. at p. 6.)  Tambon did not interview Plaintiff and she did not create a summary document of her findings.  (Id. at p. 7–8.)  According to Tambon, she did not interview Plaintiff because Plaintiff left the office the same day she filed her grievance and did not return.  (Doc. 36, p. 67.)

## III.   Plaintiff's Leave from Optim Health

The same day she sent her written grievance to Tambon, Plaintiff emailed Ashley that she had a migraine and would be going home.  (Doc. 39-2, p. 5; see doc. 29-8, pp. 27–28.)  Ashley responded that she hoped Plaintiff felt better and that no doctor's note was necessary.  (Doc. 39-2, p. 6; see doc. 29-8, pp. 27–28.)  Plaintiff did not return to work the next day, and instead reported

that her doctor instructed her to stay out of work for the remainder of the week.  (Doc. 39-2, p. 6; see doc. 29-7, p. 9.)  Ashley testified that five days later, on April 8, 2019, she tried to send Plaintiff a text message asking when she would come back to work, but it was sent to the wrong number. (Doc. 39-2, p. 6; see doc. 29-7, p. 9.)  Ashley did not have further contact with Plaintiff.  (Doc. 39-2, p. 6; see doc. 29-7, p. 11.)

On Sunday, April 7, 2019, Plaintiff emailed Optim Health and stated that she had a "follow up appointment" on Friday, April 5, 2019, and that her physician "determined that [she was] unable to return to work until further notice due to [her] condition."  (Doc. 39-2, p. 9.)  She left the phone number of her physician, asked if she needed to provide a doctor's note to HR, and requested that Optim Health send her Family and Medical Leave Act ("FMLA") paperwork.  (See doc. 29-5, p. 8.)  Tambon responded to Plaintiff the next morning stating that Jessica Drew would be her point of contact on FMLA issues.  (Doc. 39-2, p. 9.)

Drew promptly followed up and informed Plaintiff that because she had less than one year of service with Optim Health, she was ineligible for FMLA leave.  (Id.)  Drew provided Plaintiff with Optim Health's FMLA policy and had Plaintiff's paid time off ("PTO") balance sent to her. (Id.; see 29-5, pp. 5–6.)  During a phone call between Plaintiff and Drew, Plaintiff stated that she would like all communications moving forward to be by email.  (Doc. 39-2, p. 10.)  Following the phone call, Drew emailed Plaintiff asking when she would be returning to work since she had not received notification regarding her return.  (Doc. 29-5, p. 4.)  Plaintiff's daughter apparently responded to the email on Plaintiff's behalf stating that Plaintiff was "unable to respond due to her condition" and was still "under doctor[']s orders not to return [to work] until he releases her to do so."  (Id.)  Tambon testified that it is Optim Health's policy to only discuss employee matters with

the actual employee unless he or she has given permission to do otherwise.  (Doc. 36, p. 82–83; doc. 36-9.)

After attempting to call Plaintiff, Drew emailed Plaintiff on April 10, 2019, and informed her that her PTO balance would be exhausted on April 16, and if she did not return to work by April 17, then she would be considered to have abandoned her job.  (Doc. 39-2, p. 10; see doc. 29-5, pp. 2–3.)  Plaintiff responded that she would "return to work when I have been released by my physician to do so," and attached doctor's notes from April 3 and April 5.  (Doc. 39-2, p. 10; see doc. 29-5, p. 2.)  The April 5 doctor's note did not include a return-to-work date or an estimated length of time that Plaintiff would be unable to work.  (Doc. 39-2, p. 10; see doc. 29-6.)

On April 15, 2019, Plaintiff emailed Drew stating that she was suffering from an "anxiety disorder,"[2] and reiterating that she would not be returning to work "until further notice."  (Doc. 39-2, p. 10; see doc. 29-5, p. 1.)  Plaintiff did not advise Optim Health of an estimated return date but said she hoped to return "soon."  (Doc. 39-2, pp. 11–12; see doc. 29-5, p. 1.)  Plaintiff expressed that she was "hoping to have a greater time of leave," but "based on [Drew's] response, the company is not able to grant that request for additional leave."  (Doc. 29-5, p. 1.)  She requested that Drew let her know if an exception could be made to grant additional leave.  (Id.)  Drew responded that as of April 17, Plaintiff will have exhausted her PTO, which she referred to as "two weeks accommodation," and noted that "no other time off can be granted at this time."  (Id.)

Plaintiff did not return to work, and on April 17, 2019, Optim Health terminated Plaintiff's employment on the basis of job abandonment.  (Doc. 39-2, pp. 11–12; doc. 29-10, p. 3.)  Tambon testified that the Billing Department's work was falling behind as the volume of work was

---

[2]  Neither party offers evidence that Plaintiff was suffering from an anxiety disorder.  Insofar as the Court can tell, this is the only reference to Plaintiff's purported illness in the record.

increasing, and she determined that providing indefinite leave to Plaintiff was not reasonable. (Doc. 39-2, pp. 10–11; doc. 36, p. 120.)  Optim Health allowed Plaintiff to use the entirety of her PTO balance for her absence between April 3 and April 17, 2019.  (Doc. 39-2, p. 12; see doc. 29-10, p. 2; doc. 29-8, p. 30.)

## III.    Procedural History

Plaintiff filed suit against Optim Health on August 12, 2022, alleging claims under Title VII, Section 1981, and the ADA.  (Doc. 1.)  Plaintiff claims that Optim Health violated Title VII because she was discriminated against by Ashley because of her race and then was fired after she filed a race discrimination complaint (Count I).  (Id. at pp. 7–8.)  She also claims that she was discriminated and retaliated against under Section 1981 for the same reasons (Count II).  (Id. at 8–10.)  Finally, she claims that she was discriminated and retaliated against because of her disability in violation of the ADA (Count III).  (Id. at pp. 10–12.)  Optim Health then filed the at-issue Motion for Summary Judgment, arguing, among other things, that Plaintiff never requested an accommodation as required by the ADA and that Plaintiff has shown no evidence that her complaints of racial discrimination were causally related to her discharge.  (See generally doc. 28.) Plaintiff filed a Response in which she only addresses Optim Health's arguments about disability discrimination under the ADA and retaliation under Title VII and Section 1981.  (See generally doc. 39.)  Optim Health filed a Reply, (doc. 42), and Plaintiff filed a Sur-Reply, (doc. 44).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove its case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Id. (citation and emphasis omitted).  Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

### I.     Plaintiff's Claim under the ADA

Optim Health first moves for summary judgment on Plaintiff's disability discrimination claim brought under the ADA.  (Doc. 28, pp. 10–14.)  Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (quoting 42 U.S.C. § 12112(a)).  To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) [s]he is disabled; (2) [s]he was a 'qualified individual' at the relevant time, meaning [s]he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) [s]he was discriminated against because of [her] disability." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001) (quoting Reed v. Heil Co., 206 F.3d 1055, 1061 (11th Cir. 2000)).

Plaintiff's claim rests on her assertion that she was fired and was not granted an accommodation when she had to take a leave of absence because of her disability.  (Doc. 39-1, pp. 8–15.)  An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability—unless doing so would impose undue hardship on the employer.  42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).  An accommodation is "reasonable," and thus required by the ADA, only if it enables the employee to perform the essential functions of the job. See LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998).  The plaintiff bears the burden of identifying an

accommodation and demonstrating that the accommodation allows her to perform the job's essential functions.  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997); Willis v. Conopco, Inc., 108 F.3d 282, 284 (11th Cir. 1997) (to request a reasonable accommodation "[a] plaintiff must establish that (a) [s]he is handicapped but, (b) with reasonable accommodation (*which [s]he must describe*), [s]he is able to perform the 'essential functions' of the position [s]he holds or seeks") (emphasis added).  Additionally, the regulations governing the ADA explain that an employer may need "to initiate an informal, interactive process with the individual with a disability in need of an accommodation" to identify the person's limitations and potential reasonable accommodations that could overcome those limitations.  29 C.F.R. § 1630.2(o)(ii)(3).  However, "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant."  Willis, 108 F.3d at 285; see also Frazier-White v. Gee, 818 F.3d 1249, 1257–58 (11th Cir. 2016) ("[T]here is no basis for imposing liability on Defendant for failing to engage in an 'interactive process' to identify accommodations" where plaintiff does not identify a reasonable accommodation).

Optim Health argues that it did not fail to accommodate Plaintiff because she never made a reasonable accommodation request as required by the ADA.  (Doc. 28, pp. 10–12.)  Optim Health argues that Plaintiff never requested a specific period of leave and instead only stated that she would be able to return to work when she was released by her physician, which amounts to a request for indefinite leave.  (Id.)  "[B]ecause the ADA covers people who can perform their essential job functions in the present or immediate future, requests for indefinite leave so an employee can work 'at some uncertain point in the future' are inherently unreasonable."  Monroe v. Fla. Dep't of Corr., 793 F. App'x 924, 927 (11th Cir. 2019) (quoting Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003)).  In Wood v. Green, an employee who suffered from cluster

headaches requested to take a leave of absence, but he could not give a specific date on which he would return.  323 F.3d at 1311.  Weeks after taking his leave, he communicated with his employer that he was still suffering from cluster headaches, provided a doctor's note, and said he did not know when he would be able to return.  Id.  His employer then terminated his employment.  Id.  On appeal, the Eleventh Circuit Court of Appeals overturned the district court's finding that granting additional leave would have been a reasonable accommodation because the plaintiff "was not requesting an accommodation that allowed him to continue work in the present, but rather, in the future—at some indefinite time."  Id. at 1314.

The Court finds Wood instructive here.  Plaintiff took leave after claiming to suffer from a migraine and an anxiety disorder.  In her two weeks of absence, she consistently told Optim that she could not return until her doctor cleared her.  (See doc. 29-5, p. 8 (on April 5: "I am unable to return to work until further notice due to my condition"); id. at p. 4 (April 9: "[Plaintiff] is under doctor[']s orders not to return [to work] until he releases her to do so"); id. at p. 2 (April 11: "I am delighted to return to work when I have been released by my physician to do so"); id. at p. 1 (April 15: noting doctor's "advisement that I not return to work until further notice due to my medical condition").)  She additionally provided her doctor's note dated April 5, 2019, corroborating her request to be excused from work "until further notice due to her condition."  (Doc. 29-6.)  Nowhere in her correspondence with Optim Health did she give any sort of timeline or indication of when or how she would be able to resume her work responsibilities in the immediate future.  (See generally doc. 29-5.)  In short, she gave no indication that she may be able "to perform . . . her job duties in the present or in the immediate future."  Wood, 323 F.3d at 1314.

Because Plaintiff requested additional leave but could not identify how long that leave should be or when she may be cleared to return to work, her request was for indefinite leave.

Monroe, 793 F. App'x at 927 (relevant to a finding of indefinite leave was that "[plaintiff's] doctor did not give, and could not have given, a date when [plaintiff] could return to work"); Williams v. FPL Food, LLC, No. CV 119-179, 2021 WL 1112702, at *6 (S.D. Ga. Mar. 23, 2021) ("Without at least some additional information explaining when [plaintiff would be cleared to work], such a request is for an indefinite period, and thus [p]laintiff's requested accommodation was unreasonable."); see also Billups v. Emerald Coast Utilities Auth., 714 F. App'x 929, 935 (11th Cir. 2017) (even when the plaintiff could show he was suffering a temporary shoulder strain that was likely to be resolved, he was nevertheless "requesting a leave of absence that would allow him to work 'at some indefinite point' in the future" and thus the request was not reasonable); Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir. 1997) ("[A]n employer did not violate the ADA by refusing to grant an employee a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions.") (alterations adopted) (internal quotations omitted).

In an attempt to salvage her claim, Plaintiff argues her request was not for indefinite leave because she later specifically requested additional leave, to which Optim Health responded that "no other time off can be granted at this time." (Doc. 39-1, p. 9; doc. 29-5, p. 1.) According to Plaintiff, Optim Health did not engage in interactive dialogue because of its "No Additional Accommodation Policy." (Doc. 39, p. 13.) Thus, Plaintiff argues, any request for specific time would have been a "futile gesture"[3] and is therefore not required. (Doc. 39-1, pp. 10–12.) The Court disagrees.

---

[3] Under the ADA, a person with a disability is not required "to engage in a futile gesture if such person has actual notice that a[n] . . . organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188(a)(1).

It is the plaintiff's burden to establish an accommodation and establish that it is reasonable, not the employer's. Willis, 108 F.3d at 284–86. While an employer has a duty to engage in interactive dialogue following a reasonable accommodation request, Plaintiff made no such request. Indeed, in Plaintiff's email, she stated only that she "hope[d] to return to work soon" and was "hoping to have a greater time of leave." (Doc. 29-5, p. 1.) While she may have asked if an exception could be made, she gave no indication to Optim Health when she may be able to return to work or any semblance of an accommodation that would allow her to perform her job "in the present or in the immediate future." See Frazier, 818 F.3d at 1257 (because employee's request for indefinite extension was "an unreasonable accommodation as a matter of law[, a]ny failure in the interactive process must therefore be attributed to [the employee]").

Throughout this litigation, Plaintiff has claimed that if Optim Health would have offered an additional two-week accommodation to her, she would have taken it and returned to work. (See, e.g., doc. 39-4, pp. 4, 6.) However, Plaintiff's position now, with the benefit of hindsight, does not show she would have been able to work in the next two weeks because, at the time, she consistently stated that she would not return to work until cleared by her doctor at some indefinite future appointment. See Williams, 2021 WL 1112702, at *6 (denying argument that plaintiff would have been able to work in the immediate future as he was cleared for work four days after his termination, because his pre-termination request had only stated that he "would not return to work until all medical procedures were completed[, and] it did not indicate when that might be"). Even if Plaintiff could show that Optim Health maintained an unlawful policy, that does not defeat the fact that, given Plaintiff's correspondence at the time, she was seeking a request for indefinite leave. She cannot now say that Optim Health would never have allowed her an additional leave accommodation where she never requested it, *and she could not have requested it* because she did

not know when she would be cleared by her doctor.  See Santandreu v. Miami Dade Cnty., 513 F.

App'x 902, 906 (11th Cir. 2013) (plaintiff could not demonstrate a reasonable accommodation

because he "had no way of knowing when his doctor would allow him to resume full-time work").

Such an ambiguous request for leave is patently unreasonable, and Optim Health did not

discriminate against Plaintiff by failing to engage with Plaintiff to grant her request.[4]  Accordingly,

Optim Health's Motion for Summary Judgment on Plaintiff's claim of disability discrimination

under the ADA contained in Count III is **GRANTED**.

**II.     Plaintiff's Retaliation Claims under Title VII and Section 1981**

    **A.     The Court Assumes Plaintiff has Established a Prima Facie Case of Retaliation.**

        Optim Health next moves for summary judgment on Plaintiff's retaliation claims contained

in Counts I and II.  Retaliation against an employee who engages in statutorily protected activity

is barred under both Title VII and Section 1981.  See 42 U.S.C. § 2000e–3(a); CBOCS W., Inc. v.

Humphries, 553 U.S. 442, 457 (2008); Bryant v. Jones, 575 F.3d 1281, 1301 (11th Cir. 2009).  To

establish a prima facie case of retaliation under Title VII and Section 1981,[5] a plaintiff must show

that (1) she "engaged in statutorily protected activity"; (2) she "suffered a materially adverse

---

[4] For the same reasons that the Court finds Plaintiff has failed to establish a reasonable accommodation, so too does the Court find that Plaintiff has failed to show she was a qualified individual under the ADA, providing an additional basis for granting summary judgment to Defendant on this claim.  "A 'qualified individual with a disability' is an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)).  See Santandreu, 513 F. App'x at 906 (plaintiff could not establish he was a qualified individual under the ADA because he "never demonstrated that he would be able to return to work within a reasonable time," and thus he was "unable to show that he would be able to perform the essential functions of the job anytime in the reasonably immediate future").

[5] "Title VII and § 1981 'have the same requirements of proof and use the same analytical framework.'"  Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1256–57 (11th Cir. 2012) (quoting Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)).

action"; and (3) "there was a causal connection between the protected activity and the adverse action." Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010).

To show causation at the prima facie stage, a plaintiff simply has to show "that the protected activity and the adverse action were not wholly unrelated." Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc) (quoting Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277–78 (11th Cir. 2008)); Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013) (internal quotations omitted) ("To establish a causal connection, a plaintiff must show that the relevant decisionmaker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated."). A plaintiff can make this showing of causation by demonstrating "close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam). However, "mere temporal proximity," without more, "must be very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotations omitted).

The record evidence establishes that, at the time of Plaintiff's termination, Optim Health knew that Plaintiff had filed a racial discrimination grievance against Ashley on April 2, 2019. (See generally doc. 29-4.) Moreover, it is undisputed that Plaintiff's employment was terminated on April 17, 2019, just fifteen days after Plaintiff filed her HR complaint. (Doc. 29-10, p. 3.) Because Plaintiff has shown knowledge of the protected conduct and proximity to the adverse employment action, the Court assumes, without deciding, that Plaintiff has made a prima facie case of retaliation.[6]

---

[6] Optim Health also argues that Plaintiff cannot present a prima facie case of retaliation because she cannot show causation. (Doc. 28, pp. 19–20.) Because the Court finds that Plaintiff cannot prevail in a showing of causation at the pretext stage, the Court declines to address Optim Health's arguments on causation at the prima facie stage.

**B.**   **Defendant has Offered a Legitimate, Nonretaliatory Reason for Plaintiff's Termination, and Plaintiff Cannot Establish Pretext.**

Once the plaintiff establishes a prima facie case, "[t]he burden then shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse action." Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1289 (11th Cir. 2021) (citing Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020)).  The employer's burden at this stage is "exceedingly light." Perryman v. Johnson Prods. Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983).  "Because the employer's burden is one of production—not persuasion—the employer need not persuade the court that it was actually motivated by the proffered reason." Kidd v. Mando Am. Corp., 731 F.3d 1196, 1205 (11th Cir. 2013) (internal quotations omitted).  "Assuming the employer's burden is met, 'the burden shifts back to the plaintiff to establish that the reason offered by the [employer] was not the real basis for the decision, but a pretext' for retaliation." Tolar, 997 F.3d at 1289 (quoting Johnson, 948 F.3d at 1325).

Optim Health states that Plaintiff was terminated for her failure to return to work once she had exhausted all her leave.  (Doc. 28, p. 20.)  This constitutes a legitimate, nonretaliatory reason for the employment action.  See Willis, 108 F.3d at 287 ("When an employee refuses to show up for work after being informed that her failure to do so will result in the loss of her job, the employer has presented a valid, nonretaliatory reason for terminating that employee.").  Accordingly, the burden shifts back to Plaintiff to show that Optim Health's given reason was pretext.

To show pretext, a plaintiff must show that the employer's proffered reason was not the true reason for the employment decision.  Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1162–63 (11th Cir. 2006).  To determine whether an employer's reason was pretextual, "[the] inquiry is limited to whether the employer gave an honest explanation of its behavior." Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1310–11 (11th Cir. 2012).  Moreover, a

plaintiff attempting to show pretext "must meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  That means that the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted).

Additionally at the pretext stage, "the plaintiff must once again identify evidence of a causal link between her protected conduct and the employer's adverse action against her." Powe, 667 F. Supp. 3d at 1244 (citing Tolar, 997 F.3d at 1294).  This time, however, "the plaintiff must meet the more demanding 'but for' test" to show causation. Tolar, 997 F.3d at 1294.  Simply put, to establish pretext, "the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." Id.

Plaintiff points the Court to eight points to show that Optim Health's given reason was pretextual: (1) temporal proximity; (2) Optim Health failed to investigate the racial discrimination claim; (3) Optim Health has not identified another employee terminated in this manner; (4) Optim Health refused to communicate with Plaintiff's daughter and could not identify another situation where it did this; (5) Optim Health did not follow its internal procedures in the investigation; (6) it would have taken over ten weeks to train a replacement for Plaintiff; (7) Plaintiff's dismissal was based on an unlawful policy; and (8) Ashley testified inconsistently that Optim Health would have considered granting Plaintiff additional leave in violation of their purported no leave policy. (Doc. 39-1, pp. 20–24.)  Even construing all the evidence in the light most favorable to Plaintiff,

the Court fails to see how Plaintiff's purported reasons show that Plaintiff was fired because she filed an HR complaint.

As an initial matter, Plaintiff confuses the burden when pointing to Optim Health's failure to identify another time it fired an employee for job abandonment or refused to communicate with an employee's family member about the employee. (Id. at p. 22.) It is Plaintiff's burden to show evidence of pretext, not Optim Health's burden to disprove pretext. Plaintiff has submitted no evidence to show that other employees were in fact afforded this treatment and she was not. The Court also fails to see, and Plaintiff has failed to explain, how either point relates to whether Optim Health's real reason for terminating Plaintiff was her discrimination complaint.

Turning then to Plaintiff's critiques of the investigation following Plaintiff's HR Complaint, these facts are not probative of whether Plaintiff was fired because of her protected conduct. First, the evidence does not support Plaintiff's assertion that Optim Health failed to investigate her claim. Optim Health has submitted ample evidence, unrebutted by Plaintiff,[7] that Tambon interviewed people named in Plaintiff's grievance letter, took statements, and looked at the treatment of other employees in the Billing Department. (Doc. 39-2, p. 8; doc. 29-10, p. 2; doc. 36, pp. 67, 120–24.) According to Tambon, she concluded that Plaintiff had been subjected to the same scrutiny as other employees in the Billing Department after Workman was brought on, and that Plaintiff's claim that Ashley sabotaged the interview with Magdeburg and Gruder was unfounded. (Doc. 39-2, p. 8; doc. 29-10, p. 2; doc. 36, p. 67.)

---

[7] Plaintiff's position that Tambon failed to investigate appears to be based on Ashley's testimony that she did not learn about the racial discrimination complaint until after Plaintiff was terminated. (Doc. 39-2, pp. 6–7 (citing doc. 37, p. 60).) The Court does not see how that meaningfully rebuts Tambon's undisputed testimony that she conducted an investigation. It was not necessary for Tambon to tell Ashley about the grievance in order to investigate it, and Tambon may have chosen not to tell Ashley because the grievance—and thus the investigation—focused heavily on actions taken by Ashley.

While Tambon admits that she did not interview Plaintiff and did not know if she had drafted a summary of findings, both of which were her standard practice when facing similar grievances, (doc. 36, pp. 19–23, 67, 69–70), this does not necessarily indicate pretext.  "An employer's departure from its normal policies and procedures can, in some cases, serve as evidence of pretext."  Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 829 (11th Cir. 2019) (citing Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1299 (11th Cir. 2006)).  "But mere failure to follow operating procedures, without more, does not necessarily suggest that an employer was motivated by illegal . . . intent or that its proffered reason for termination was pretextual."  Id.; see Mitchell v. USBI Co., 186 F.3d 1352, 1355–56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").  Rather, to establish pretext based on failure to follow internal procedures, a plaintiff must show that the employer's deviation from policy occurred in a retaliatory manner.  See Rojas v. Florida, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002); Palmer v. Potter, No. 1:08-CV-3876, 2010 WL 11500520, at *52 (N.D. Ga. Jan. 12, 2010) ("Deviation from a policy or procedure may be evidence of pretext if the deviation occurred in a discriminatory manner."), *report and recommendation adopted*, 2010 WL 11508700 (N.D. Ga. Mar. 25, 2010).  Plaintiff has proffered no evidence to show that Tambon's handling of her grievance was somehow motivated by retaliatory animus.  Simply put, the Court does not see, and Plaintiff has not explained, how any alleged deficiencies in Tambon's investigation somehow show that Plaintiff was thereby fired for filing the grievance rather than for failing to return to work.  See, e.g., Connelly, 758 F. App'x at 830 (no basis for finding that failure to follow internal policies rendered employer's proffered reason "unworthy of credence").

Plaintiff also argues that Optim Health should have given her additional leave time because it would have taken at least ten weeks to train a new hire to replace her.  (Doc. 39-1, p. 23.)

However, a plaintiff's challenge of an employer's proffered reason "must meet [the] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030.  It is not the Court's job to analyze what would have been the best business decision for Optim Health.  See Alvarez, 610 F.3d at 1266 ("[I]t is not our role to second-guess the wisdom of an employer's business decision—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory [or retaliatory] motive.").  That a plaintiff's evidence suggests that an employment decision was unwise, unfair, or inaccurate does not alone suggest that it was discriminatory or retaliatory.  See id. at 1266–67. Accordingly, Plaintiff's criticism of Optim Health's business decision does not give rise to an inference of retaliatory motive.

Plaintiff's other arguments likewise fail to convince the Court that the decision to terminate Plaintiff's employment was based on her racial discrimination complaint.  Plaintiff argues that Optim Health's leave policy was unlawful and this necessarily "supports a finding of pretext." (Doc. 39-1, p. 24.)  Even if the Court accepted Plaintiff's argument that the policy was unlawful, Optim Health's enforcement of such a policy to Plaintiff does not support an inference that Optim Health had a *retaliatory* motive.[8, 9]  Additionally, Ashley's testimony that Optim Health would have considered giving an additional two-week leave if Plaintiff had asked does not have any

---

[8]  In the case cited by Plaintiff to support this point, EEOC v. Yellow Freight System, Inc., No. 98 Civ. 2270 (THK), 2002 U.S. Dist. LEXIS 16826 (S.D.N.Y. Sept. 9, 2002), the court was considering pretext under the framework of a claim of disability *discrimination*.  There, the court found that the defendant could not show a legitimate, nondiscriminatory reason by claiming it was following a policy where that policy itself was found to be discriminatory against disabled persons.  Id. at *65–66.  Plaintiff has not explained how this case is relevant to a pretext analysis on a *retaliation* claim, as here.  Accordingly, the case bears *de minimis* weight on the pretext analysis here.

[9]  Insofar as Plaintiff wished to use this evidence to support a claim of retaliation under the ADA, for reasons discussed in Discussion Section III, infra, the Court finds that she has abandoned that claim.

relevance to whether Plaintiff was retaliated against for filing her complaint of racial discrimination.

Finally, then, Plaintiff relies on temporal proximity to support her pretext argument.  While temporal proximity can be considered in a pretext analysis, temporal proximity alone is not enough to survive summary judgment.  Gogel, 967 F.3d at 1137 n.15.  Moreover, Optim Health argues that any temporal proximity argument is undercut by the "intervening event" of Plaintiff's absence from work.  Id.; Robertson v. All Am. Quality Foods, Inc., 246 F. Supp. 3d 1365, 1385 (N.D. Ga. 2017) ("intervening factor" of missing work after being warned against further unauthorized absences "establishes a non-discriminatory reason that directly bears on [plaintiff's] later discharge"); Frazier v. Sec'y, Dep't of Health & Hum. Servs., 710 F. App'x 864, 870 (11th Cir. 2017) ("intervening act" of absence without leave is definitive evidence to rebut pretext); (doc. 28, p. 20).

In sum, Plaintiff has failed to produce evidence tending to show that Optim Health's stated reason for Plaintiff's termination was dishonest or that her complaint of race discrimination was the but-for cause of her termination.  Because Optim Health has provided a legitimate, nonretaliatory reason which Plaintiff has failed to rebut, the Court **GRANTS** Optim Health's Motion for Summary Judgment on Plaintiff's retaliation claims under Title VII and Section 1981.[10]

---

[10]  Plaintiff also mentions that her claim can survive under a "convincing mosaic" of evidence.  (Doc. 39-1, p. 16.)  Under a general convincing mosaic approach, a plaintiff can survive summary judgment "if he presents circumstantial evidence that creates a triable issue concerning the employer's . . . intent."  Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (discussing convincing mosaic approach in context of a discrimination claim).  However, for the reasons described in the Court's pretext analysis, Plaintiff has identified no facts showing Optim Health's retaliatory intent and provides no further argument as to why a convincing mosaic approach would overcome Optim Health's Motion.  (See generally doc. 39-1, pp. 15–17.)  Moreover, the Eleventh Circuit "[has] yet to decide in a published decision whether retaliation claims can survive summary judgment under a convincing-mosaic theory."  Reyes v. Fed. Express Corp., No. 21-12639, 2022 WL 3867901, at *4 n.2 (11th Cir. Aug. 30, 2022).  Accordingly, the Court is not persuaded that analyzing Plaintiff's claim under a convincing mosaic framework would yield a different result.

### III.     Plaintiff's Remaining Claims

Optim Health also moved for summary judgment on Plaintiff's remaining claims: racial discrimination claims under Title VII and Section 1981 (contained in Counts I and II), and a retaliation claim under the ADA (contained in Count III)[11].  (Doc. 28, pp. 13–19.)  As Optim Health points out in its Reply brief, Plaintiff neglected to address its arguments as to these claims.  (Doc. 42, pp. 8–9.)  "When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned."  State Farm Mut. Auto. Ins. Co. v. Robert Eugene Marshall & Thomasina Parks, 175 F. Supp. 3d 1377, 1385 (S.D. Ga. 2016) (alterations adopted) (quoting Jones v. Bank of Am., N.A., 564 F. App'x 432, 434 (11th Cir. 2014)).  Plaintiff has thus abandoned her claims of racial discrimination contained in Counts I and II as well as her claim of retaliation under the ADA contained in Count III.  In light of Optim Health's logical and well-cited arguments, and absent any allegations or argument from Plaintiff to the contrary, the Court **GRANTS** Optim Health's Motion as to these claims.

---

[11]  As to the racial discrimination claims under Title VII and Section 1981, Optim Health argued that Plaintiff cannot point to evidence of severe or pervasive conduct to support a hostile work environment claim or nor can she show that employees of a different race were treated more favorably than she was.  (Doc. 28, pp. 14–19.)  As for the retaliation claim under the ADA, Optim Health argued that there is no evidence that Plaintiff engaged in any relevant protected activity.  (Id. at pp. 13–14.)

**CONCLUSION**

In sum, Plaintiff has failed to raise a genuine issue of material fact that she was fired because of her disability or because she filed a complaint of racial discrimination. Additionally, Plaintiff has abandoned her remaining claims of retaliation under the ADA and racial discrimination under Title VII and Section 1981. Accordingly, the Court **GRANTS** Optim Health's Motion for Summary Judgment on all counts. (Doc. 28.) With no further claims remaining, the Court **DIRECTS** the Clerk of Court to **CLOSE** this case.

**SO ORDERED**, this 29th day of March, 2024.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA